# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 8:09CR285 |
| vs. ) | |
| ) | FINDINGS AND |
| JOSE LOPEZ TORRES, ) | RECOMMENDATION |
| ) | |
| Defendant. ) | |

This matter is before the court on the motion to suppress evidence (Filing 16) filed by the defendant, Jose Lopez Torres. An evidentiary hearing was held on January 8, 2010. The motions was deemed submitted on February 11, 2010, upon the filing of the hearing transcript (Filing 36).

The defendant's vehicle was stopped and searched on June 10, 2009 by a deputy Douglas County Sheriff. A canine sniff was conducted, the dog indicated to the odor of illegal narcotics, and the deputy found 13 one-pound bundles of methamphetamine in the vehicle. Defendant now alleges that the deputy did not have probable cause to stop his vehicle, he was illegally detained, and the deputy searched the vehicle without a warrant, all in violation of his Fourth Amendment rights. Defendant's motion indicates that it was filed for the sole purpose of "leaving the government to its burden" of proving a basis for the warrantless search, the fact and validity of the defendant's consent to the search, and the fact and reliability of the service dog's indication. Filing 16 at ¶¶ 4-6.

The court recommends that the defendant's motion be denied.

## I.  FACTUAL BACKGROUND

Edward Joseph Van Buren, the officer who stopped the defendant's vehicle, testified that he has been with the Douglas County Sheriff's Office for 24 years. He has been a dog handler since 1994 and has worked with six dogs. Van Buren became a canine sergeant in September 2001 and now supervises five canine interdiction deputies, conducts training for the deputies and the canines, and conducts outside agency training and certification. On June 10, 2009, Van Buren was paired with a Belgian Malinois named Rex.

The dog, Rex, was procured in August 2008 from Metro Dade K-9, a service dog vendor located in Miami, Florida. Van Buren and Rex went through a "dual purpose" certification process in October 2008. A "dual purpose" dog is trained in patrol functions as well as narcotics detection.

Van Buren testified that he and Rex participated in a "Polizei Spuerhund Pruefung" or "PSP" certification process, consisting of 14 actual drug finds and 10 scenarios. The process incorporates numerous diversions and distractions. A "find" involves a narcotics hide. A "scenario" involves the setting and conditions in which the finds are placed. Van Buren and Rex passed the certification process and are certified by the State of Nebraska. The topics of the dog's purchase, medical history, training, and certification were explored in great detail on cross-examination.

In the spring of 1998, Sergeant Van Buren completed the training necessary to become an Evaluator and to conduct certifications. The course included two weeks of classroom and

practical training. The persons being trained evaluated dogs in the presence of a judge, Nebraska State Patrol Captain Mike Kerby. The candidates also had to take a written test and write a research paper.

In the summer of 1999, Van Buren became a certified Instructor, meaning that he was qualified to train dogs teams to a skill level so they can become certified in the State of Nebraska in narcotics detection and patrol functions. His training course included an additional eight to 10 weeks of classroom and practical training, taking a written test, and writing a research paper. The trainees assisted in the training of several dog teams under the guidance of Captain Kerby.

Van Buren received additional training, becoming a "Judge" in March 2009. This is an international certification enabling Van Buren to provide international certifications for dog teams in narcotics and patrol functions. To obtain this certification, he worked and trained with Captain Kerby over a period of time, evaluating dogs and assisting in the training of dog teams. He also had to take a written test and complete an extensive research paper.

The topics of Sergeant Van Buren's training, experience, and qualifications were thoroughly explored during cross-examination.

On June 10, 2009, Sergeant Van Buren was working in uniform and using a fully equipped marked vehicle. Rex was in the back of the vehicle in an area separated from the front seat by a cage and Plexiglas. He came in contact with the defendant, Jose Lopez Torres

at about 12:24 p.m. while traveling eastbound on Interstate 80 near the "L" Street exit. Van Buren was following the defendant, who was also traveling eastbound in a 1999 Chevy Blazer. He observed the defendant following a semi tractor trailer at a dangerously close distance, i.e., approximately one car length behind the semi. Defendant's vehicle would back off from the semi and then get close to the semi and was traveling 65 miles per hour in a posted 60 mile-per-hour zone.

Van Buren stopped the defendant on I-80 eastbound near 96th Street by activating his red and blue flashing lights. Defendant responded to the lights and pulled over. Van Buren approached the passenger side of the Blazer and spoke with the defendant, who was the only occupant. Speaking in English, Van Buren explained the reason for the stop, obtained documents, and asked the defendant to step back and have a seat in the police cruiser. The defendant responded and went back to the cruiser, as requested.

Sergeant Van Buren ran a check through DEA and spoke with defendant about his travel itinerary. The defendant said he was en route to Illinois and Kansas City. When Van Buren tried to clarify the location, defendant indicated he was going past Illinois and "ultimately settled on Kansas City as his destination to visit a niece." (Filing 36, 13:22-14:1). The defendant was unable to tell Van Buren his niece's name, and had to look up the name on his cell phone. He then attempted to show Van Buren a picture of his granddaughter from the cell phone, but his hand was shaking so badly that Van Buren could not see what was on the screen of the phone. Defendant began looking around, looking out the window. Van

Buren testified that it is his practice in conducting a traffic stop to bring the person back to his vehicle and talk to them, and the defendant's level of nervousness was atypical.

The DEA check did not return any wants or warrants, and Van Buren told the defendant he would only be getting a verbal warning. The defendant, however, remained nervous.

Van Buren returned the defendant's documents and then asked if he could ask the defendant additional questions. The defendant acknowledged that he could. (Exhibit 1 at 12:44:30). Speaking in English, Van Buren asked if there were any drugs, large amounts of marijuana, cocaine or methamphetamine in the vehicle. Defendant responded no. Van Buren then asked if he could search the vehicle. Defendant indicated that he could, but mentioned he was tired. (See Exhibit 1 at 12:44:44).

Exhibit 1 demonstrates that Sergeant Van Buren advised the defendant at least twice that he did not have to consent to the search. To make sure the defendant understood what was being asked, Van Buren retrieved a form (Exhibit 2) with questions written in English and Spanish, showed defendant the question he was asking, and asked the defendant to read it out loud. Specifically, Van Buren pointed to the section of the form that says, "With your permission I want to search your car. Yes or no," and asked defendant to read the translation to the right in Spanish. Defendant appeared to read the form and read it out loud in Spanish. The defendant then acknowledged that Van Buren could search the vehicle. Van Buren once

again told defendant to let him know if, at any time, he wanted Van Buren to stop. (Exhibit 1 at 12:46:18-12:47:42).

Van Buren and two other deputies began searching the defendant's vehicle. Van Buren testified that he noticed there were "absolutely no signs of 'tamperment'" behind panels and in areas where they routinely search for contraband. (Filing 36, 19:1-5). The Blazer appeared typical, until he looked at the underside. Sergeant Van Buren got on the ground, looked underneath towards the gas tank, and noticed one of the two bolts securing the gas tank was severely tooled. (See Exhibit 1 at 12:50:00). Van Buren testified that the bolt was very shiny and looked like it had been removed and reinstalled numerous times. It was so tooled that Van Buren questioned whether the correct size socket would work on the bolt. The other bolt was also tooled quite a bit. It appeared that the gas tank had been taken on and off numerous times, and very recently. Sergeant Van Buren acknowledged on cross-examination that a vehicle's fuel tank might be removed for legitimate mechanical purposes. (Filing 36, 85:20-23).

Van Buren returned to the cruiser and advised the defendant that he would like to take the vehicle in and have the gas tank examined at the county shop. Defendant responded to the effect that he wanted to leave, which Van Buren understood to be a revocation of his consent. (Filing 36, 87:20-24; Exhibit 1 at 13:07:40). Van Buren then said he would walk a drug detection dog around the vehicle.

Sergeant Van Buren retrieved Rex from the cruiser. Using a 42-inch leash, Van Buren walked Rex to the back of the vehicle and gave the command for Rex to search for drug odor. They walked counterclockwise around the defendant's vehicle. (See Exhibit 1 at 13:09:30). After making one complete circuit, Rex alerted, showing "a lot of interest" in the back underside of the Blazer. The video shows Sergeant Van Buren stooping down at this point. (See Exhibit 1 at 13:09:48). Van Buren testified that, during the second circuit, Rex displayed a more intense alert to the underside near the front end, up around the radiator and grill area, by bringing his head down and sniffing down below the bumper. (Filing 36, 71:5-72:1). Once he got to the middle front of the vehicle, Rex "detailed" the area, alerting to the underside and grill area. (See Filing 36, 71:2-23). Rex then indicated to the odor of drugs by immediately sitting.

Sergeant Van Buren explained that a dog "alerts" to a drug odor when it is picking up odor but has not yet pinpointed the source. A dog manifests an alert by a change in behavior. For example, the dog begins by walking around the vehicle, sniffing. An "alert" occurs when the handler sees "head snaps," or the dog starting to go to specific areas, or the dog slowing down and detailing an area on its own. "Indication" is the final act, occurring when the dog has pinpointed the strongest source that he can locate. Rex is a passive indication canine, meaning that he will sit or stand and stare upon indicating to the odor of drugs that he was trained to detect.

After Rex indicated, Van Buren "cheated him off" by pulling him away from the location and completed the second circuit of the car. (Filing 36, 88:22-89:1). Van Buren returned Rex to the police cruiser, told the other officers that Rex indicated to the front of the vehicle, and may have told the defendant that the dog indicated. The defendant was detained. His vehicle was then towed to the county garage and put on a lift. The officers examined the gas tank and found 13 plastic-wrapped bundles of methamphetamine.

Defendant was arrested upon the discovery of the methamphetamine. He was interviewed by another officer at the Sheriff's facility.

The traffic stop was recorded with a camera located in the police cruiser, which was parked behind the defendant's vehicle. The video recording was received as Exhibit 1. Sergeant Van Buren acknowledged that the dog indicated at the front of the defendant's vehicle, and the dog's indication was not visible on the video recording.

An expert witness, Dr. Lawrence J. Myers, testified for the defense. Dr. Myers is an associate professor at the College of Veterinary Medicine at Auburn University, where he teaches courses in animal behavior and neuroscience. Since 1982, his research at Auburn has been primarily in aspects of detector dogs. Dr. Myers' work has also included aspects of detector dog training and deployment, as well as the evaluation of drug detector dogs.

Dr. Myers testified that dogs can be used to detect pretty much anything that has a unique scent associated with it. (Filing 36, 97:22-98:1). In law enforcement, dogs are used to detect narcotics, people and explosives; however, dogs are also used to detect things such

-8-

as pipeline leaks, termites and bedbugs. Myers has worked in all these areas. He has worked with and for a number of agencies and associations, including the House and Senate Commerce Committees (primarily on aspects of explosive detection on airlines) and the Senate Judiciary Committee (in techniques of detecting illicit narcotics). Dr. Myers has also provided advice to various branches of the U.S. Department of Defense, the Federal Aviation Administration, the FBI, the Secret Service, and the Bureau of Alcohol, Tobacco and Firearms. In the area of drug detection, Dr. Myers' services to federal agencies range from a simple short course on behavior and the sense of smell, up to reviewing policies and procedures the agencies use to train and maintain their teams in the field. Dr. Myers has also consulted with state and local law enforcement agencies and was familiar with the training procedures described by Sergeant Van Buren.

Dr. Myers testified that he has worked with various law enforcement agencies and related organizations to develop protocols and standard operating procedures for the use of drug detection dogs. He began working with drug dogs in 1984 or 1985 and has observed hundreds or even thousands of teams since that time. He acknowledged there is "more than one way to train a dog handler team," and there were methods to objectively determine whether the results are reliable. (103:1-6). On cross-examination, Dr. Myers acknowledged that he was not a certified law enforcement officer, had never handled a drug detector dog as a canine officer, and has not ever trained a drug detector dog as a canine officer.

In this case, Dr. Myers reviewed the DVD recording of the incident involving the defendant and Sergeant Van Buren, training and deployment records for Rex, and the policy manual for the county's K-9 unit.  Based on his review of the documents and the recording of the dog deployment, Dr. Myers opined that the recording does not reflect that an indication occurred, as "there should have been a second or two of hesitation at some point in the front of the vehicle if in fact the full-blown indication had actually occurred."  (Filing 36, 113:8-12).

In reaching this conclusion Dr. Myers noted that there was a good description of Rex's indication behavior (to sit and stare), and Sergeant Van Buren had testified that Rex had to be "cheated off" after indicating.  The dog would have taken some time to alert, to pinpoint the odor, sit and stare, and then get up and move away.  Myers could view Van Buren, at least in part, during the entire circuit of the vehicle, and detected no change in Van Buren's rate of movement.  The dog was on a relatively short 42-inch lead, and, in Dr. Myers' opinion, could not have alerted and indicated without impeding Sergeant Van Buren's progress.  Dr. Myers did not believe there was time for Rex to perform that sort of indication. He saw no evidence of an indication on the recording, Exhibit 1.  (Filing 36, 107:19-108:16).

Dr. Myers testified on cross-examination that, based on his observations of many dogs and handlers, there should have been a second or two of hesitation at some point in the front of the vehicle if, in fact, Rex had alerted; however, he did not know how rapidly or slowly Rex tends to respond when giving an indication.  In any event, he had never seen a dog that

-10-

could respond that quickly to identify, pinpoint, sit, stare, get back up, and then follow the handler without seeing some discernible hesitation on the part of the handler.  (Filing 36, 113:20-24).  In general, it is important for the handler not to vary the pace in order to avoid cuing the dog; however, if the final behavioral response is to sit and stare, the dog has stopped moving and the handler has to stop.  Dr. Myers again noted that Rex was on a short lead (most handlers he dealt with tended to use something like a six-foot lead) and agreed that the observable movements of Sergeant Van Buren, the length of the lead, and the movements necessary to signal an indication were all inconsistent with an indication having taken place on the recording.

## II.  LEGAL ANALYSIS

### A.  Traffic Stop

An officer's decision to stop an automobile is reasonable if the officer has probable cause to believe that a traffic violation has occurred.  Any traffic violation, however minor, provides probable cause for a traffic stop.  *United States v. Adler*, 590 F.3d 581 (8th Cir. 2009).  Once an officer has probable cause, a traffic stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant.  Nor is it relevant that the officer may have ignored the violation "were it not for 'a suspicion that greater crimes are afoot.'"  *United States v. Arciniega*, 569 F.3d 394, 397 (8th Cir. 2009).  "An otherwise constitutional traffic stop is not invalidated by the fact that it was 'mere pretext for a narcotics search.'"  *United*

*States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) (quoting *United States v. Williams,* 429 F.3d 767, 771 (8th Cir. 2005)).

Sergeant Van Buren testified he stopped the defendant's vehicle because he saw it following a semi tractor trailer at a dangerously close distance. The infraction of following too closely violates Neb. Rev. Stat. § 60-6,140(1). *See, e.g., United States v. Romero*, — F. Supp. 2d — , 2010 WL 378246 at *2 (D. Neb., Feb. 1, 2010). The court finds Sergeant Van Buren's testimony to be credible and finds that Van Buren had probable cause to stop the defendant's vehicle for a traffic violation.

**B. Conduct and Duration of the Traffic Stop**

After making a traffic stop, an officer may detain the driver while he completes routine tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and writing up a citation or warning. *United States v. Munoz*, 590 F.3d 916, 920-21 (8th Cir. 2010); *United States v. Barragan*, 379 F.3d 524, 528-29 (8th Cir. 2004); *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999). The officer may also inquire about the occupants' destination, route, and purpose. *United States v. Suitt*, 569 F.3d 867, 870-71 (8th Cir.) , *cert. denied*, 130 S. Ct. 521 (2009).

> "Once this initial investigation is finished, however, the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, 'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention' or unless the continued encounter is consensual." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007), quoting *United States v. Jones*, 269 F.3d 919, 925 (8th

> Cir. 2001). If the encounter becomes consensual, it is not a seizure, "the Fourth Amendment is not implicated, and the officer is not prohibited from asking questions unrelated to the traffic stop or seeking consent to search the vehicle." *Id*.

*United States v. Munoz*, 590 F.3d at 921.

Here, the video recording (Exhibit 1) closely corroborates Sergeant Van Buren's testimony about what occurred during the traffic stop. The defendant had been detained for approximately 20 minutes when Van Buren returned the defendant's documents and told the defendant he would only be getting a verbal warning. This was a reasonable amount of time in which to conduct the traffic stop.

**C. Consent to Search**

Once Sergeant Van Buren decided to give the defendant a verbal warning, the purpose for the traffic stop ended, and the Fourth Amendment limited any subsequent detention or search unless the encounter became consensual. *See United States v. Suitt*, 569 F.3d at 871. If the encounter became consensual, the defendant was no longer seized, the Fourth Amendment was not implicated, and Van Buren was not prohibited from asking questions unrelated to the traffic stop or seeking consent to search the vehicle. *See United States v. Munoz*, 590 F.3d at 921.

Based on Sergeant Van Buren's testimony and Exhibit 1, the court finds that the defendant voluntarily agreed to continue speaking with Van Buren after receiving the verbal warning. Van Buren then asked for permission to search the vehicle. Van Buren clearly advised the defendant more than once that he did not have to consent, and used a Spanish

language form (Exhibit 2) to verify that the defendant understood what was being asked of him. The court finds that the defendant voluntarily consented to the search of his vehicle.

The court further finds that the defendant revoked his consent after Sergeant Van Buren asked if the officers could remove and examine the vehicle's gas tank. Exhibit 1 demonstrates that the two assisting officers concluded their search in less than one minute, and the service dog was deployed within two minutes after the defendant revoked his consent to search. Dog sniffs of the exterior of a vehicle are not searches under the Fourth Amendment, *United States v. Suitt*, 569 F.3d at 870, and may be conducted without reasonable suspicion.

In *Suitt*, the Eighth Circuit noted that it had "repeatedly upheld dog sniffs that were conducted within a few minutes after a traffic stop ended." 569 F.3d at 873. In this case, the dog sniff took less than two minutes and concluded within a few minutes after the defendant revoked his consent to search. Considering all the circumstances, the court finds that the canine sniff constituted no more than a *de minimis* extension of the traffic stop and was not the result of an unconstitutionally prolonged traffic stop.

**D. Probable Cause Based on Dog's Indication**

In this case, the government relies on the dog's positive indication to establish probable cause to arrest the defendant and seize the Chevy Blazer.

> Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." [*Illinois v. Gates*, 462 U.S. 213, 238 (1983).] Determining whether probable cause exists at the time of the search is a "commonsense, practical question" to be judged from the

> "totality-of-the-circumstances. *Id.* at 230. "Probable cause ... does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (quoting *United States v. Sawyer*, 224 F.3d 675, 678-79 (7th Cir. 2000)); *see also United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006) (pointing out that reasonable suspicion has a lower threshold than probable cause and a considerably lower threshold than preponderance of the evidence); *Gates*, 462 U.S. at 244 n.13.

*United States v. Donnelly*, 475 F.3d 946, 954-55 (8th Cir.), *cert. denied*, 551 U.S. 1123 (2007) (parallel citations omitted). In this jurisdiction, a positive alert by a reliable drug detection dog constitutes proof of probable cause.

> Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present. *United States v. Sundby*, 186 F.3d 873, 875-76 (8th Cir. 1999). In finding sufficient the affidavit at issue in *Sundby*, we declared that "[in order to establish the dog's reliability,] the affidavit need only state the dog has been trained and certified to detect drugs.... An affidavit need not give a detailed account of the dog's track record or education." *Id.* at 876 (citations omitted). Such statements only establish the affidavit's facial validity, however. *Id.* (holding that the defendant would have been entitled to a *Franks* hearing had he shown that officers withheld negative information casting into doubt the dog's reliability).

*Id.* at 955.

The primary issue raised by the defendant is whether Rex actually indicated at the front of the Chevy Blazer. The court has carefully considered the testimony of Dr. Myers who, after reviewing the recording, opined that there was not time for Rex to have indicated in the way described by Sergeant Van Buren. Specifically, Dr. Myers found lacking "a second or two of hesitation at some point in the front of the vehicle if in fact the full-blown

-15-

indication had actually occurred."  (See Filing 36, 113:8-12).  Focusing on this testimony, the court re-reviewed the relevant portion of the recording several times.  Although some shadowy activity at the front of the vehicle can be seen through the Blazer's back window and windshield, the view is significantly obscured by the tinted back window and the vehicle's headrests.

Sergeant Van Buren remained visible over the roof of the vehicle during the first circuit and can be seen going around the front of the vehicle.  He stooped down at the conclusion of the first circuit when the dog alerted at the back underside of the Blazer. During the second circuit, Van Buren appeared to maintain a fairly steady pace, but stooped down on several occasions.  In contrast to the first circuit, Van Buren did not remain visible over the roof while he and Rex were at the front of the vehicle during the second circuit. Considering the time it took for Van Buren and Rex to turn the corner from the passenger side to the front and to emerge from the front corner to the driver's side, it did appear to the court that the process took about three seconds longer during the second circuit than it did during the first circuit.  Finally, Dr. Myers has acknowledged that he did not know how rapidly or slowly Rex tends to respond when giving an indication.

With all due respect to Dr. Myers, the court must give greater weight to Sergeant Van Buren's testimony that Rex indicated at the front of the Chevy Blazer, based on the court's own review of Exhibit 1, Van Buren's other credible testimony, and Van Buren's familiarity with the dog, Rex.  Accordingly, the court finds that the dog did indicate at the front of the

defendant's vehicle, giving the officers probable cause to place the defendant under arrest, seize the vehicle, and search the vehicle's fuel tank.

### III.  RECOMMENDATION

For all the reasons discussed above,

**IT IS RECOMMENDED** that the defendant's motion to suppress evidence (Filing 16)  be denied.

A party may object to the magistrate judge's findings and recommendation by filing an "Objection to Magistrate Judge's Findings and Recommendation" within 14 days after being served with the findings and recommendation.  The objecting party must comply with all requirements of NECrimR 59.2.

**DATED March 10, 2010.**

               **BY THE COURT:**

               **s/ F.A. Gossett**
               **United States Magistrate Judge**